## BATES COUNTY REDI–MIX, INC., Appellant,

v.

## Loren D. and Debbie K. WINDLER, d/b/a Windler Backhoe Services, Defendant,

Michelle L. Cole, Respondent,

and

## National City Mortgage, d/b/a Commonwealth United, Respondent.

No. WD 63152.

Missouri Court of Appeals, Western District.

Feb. 22, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 2005.

Lynn K. Ballew, Harrisonville, for appellant.

Richard Koehler, Butler, Dennis Campbell Owens, Kansas City, for Michelle Cole, respondent.

John Pursley, Butler, and Jeffrey Weisman, Earth City, for National City Mortgage, respondent.

RONALD R. HOLLIGER, Judge.

Bates County Redi–Mix, Inc., ("Bates") appeals from a judgment denying it a mechanic's lien against property owned by Michelle Cole. It is undisputed that Bates furnished concrete to the subcontractor of a general contractor hired by Cole. The

concrete was improperly installed, rendering the entire foundation unusable and necessitating that it be completely torn out and replaced. In a case of first impression, Bates asks, as an innocent materialman, to be awarded a lien for its material, even though the material it supplied was never incorporated into the final structure and added no value to the property. We hold that Bates was entitled to a mechanic's lien upon Cole's property and reverse and remand with directions that the trial court enter judgment in favor of Bates on its lien claim.

### FACTS AND PROCEDURAL BACKGROUND

Michelle Cole purchased land in Bates County upon which she intended to place a manufactured home. The manufactured home needed to be set upon a basement foundation, and she contracted with Loren Windler, as general contractor, to erect the foundation. Windler, in turn, engaged Mr. Beers[1] as a subcontractor to construct concrete forms and to pour the concrete for the project. Windler also contracted with Bates County Redi–Mix, who would supply the concrete for the basement foundation.

Bates delivered concrete to the construction site on November 15, 1999, and December 2, 1999. Shortly thereafter, it was discovered that the basement foundation was unsuitable for installation of the manufactured home. In places, the basement walls were out of plumb by several inches. In other places, the walls bowed significantly. The basement, as a whole, was also wider than much of the manufactured home. The construction methods introduced dry joints[2] that would be prone to water leakage. There were also parts of the foundation, such as frost footings, and adjacent structures, such as retaining walls, that were not poured at all. Thus, the work performed was both defective and incomplete.

There was no claim that any of these problems were due to the materials supplied by Bates or that those materials were in any way unsuitable. Instead, all of these deficiencies were due to errors made by Beers in setting up the concrete forms for the project and mistakes made by him during the pouring of the concrete into the forms.

Windler and Beers suggested possible ways of correcting the deficiencies in the work. However, Cole concluded that those suggestions would not resolve the problems in a satisfactory manner. Therefore, she instructed Windler to completely remove the foundation. The foundation was completely demolished and transported off Cole's land. Cole later obtained the services of a different contractor who built a replacement foundation. Cole ultimately placed her manufactured home on the second foundation.

Cole did not pay Windler for either labor or materials for the work on the original foundation. Windler stopped payment on a check provided to Bates for the concrete it supplied and Bates' services in pumping the concrete. The check, in the amount of $4,065.47, was returned unpaid. Windler subsequently paid Bates a portion of that amount as restitution arising out of criminal charges, leaving an unpaid balance due to Bates in the amount of $2,914.47 for its materials and services.

Bates timely provided Cole notice of its intent to seek a mechanic's lien on the property for the unpaid balance. It filed

---

1. This person's given name is not apparent on the face of the record.

2. A "dry joint" or "cold joint" is where concrete is poured on top of other concrete that has already begun to set and become firm.

suit to perfect its lien on June 2, 2000. The matter proceeded to trial, and the trial court initially entered judgment in favor of Bates. Cole and her mortgagor subsequently filed a motion for new trial. Upon that motion, the trial court concluded that its original judgment was in error and set it aside.

The trial court's final judgment, issued on July 24, 2003, found that Bates was not entitled to a mechanic's lien against Cole's property because the concrete it supplied was completely removed from the property and was not incorporated in any manner in the rebuilt foundation. Bates now appeals.

## DISCUSSION

Bates raises two points in the present appeal. In its first point, it argues that the trial court erred in denying its claim for a mechanic's lien because its lien interest attached to the property at the time it provided materials that were used in the construction of the original basement and foundation on Cole's property. In its second point, Bates contends that, even if it was not entitled to a mechanic's lien against the finished structure on Cole's property, given that none of the Bates-supplied concrete was used in its construction, the trial court erred by refusing to recognize that it had a valid lien against the land itself. We find Bates' first point to be dispositive.

As a bench-tried case, our review of the trial court's judgment is conducted under the *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), standard of review. *See Ken Cucchi Constr. Inc. v. O'Keefe*, 973 S.W.2d 520, 523 (Mo.App.1998). In both points on appeal, Bates contends that the trial court

misapplied the law in reaching its judgment. With regard to conclusions of law, we conduct our review independently and do not defer to the trial court. *See Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 887 (Mo.App.1995). Of course, determining the correct legal conclusion depends upon the operative facts before the court. In determining what the facts before the court were, we view the evidence in the light most favorable to the judgment, disregarding all contrary evidence. *See Ken Cucchi Constr.*, 973 S.W.2d at 524.

Mechanic's liens were unknown at common law and exist purely as a creature of statute.[3] Section 429.010 provides, in relevant part:

Any person who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, ... under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor, ... upon complying with the provisions of sections 429.010 to 429.340, shall have for his work or labor done, or materials, ... a lien upon such building, erection or improvements, and upon the land belonging to such owner or proprietor on which the same are situated, ... to secure the payment of such work or labor done, or materials ... furnished[.]

This section has remained substantially unchanged since 1855, save for amendments expanding the classes of claimants covered (such as nurserymen) or other minor, technical, changes. *See* Chap. 109 Section 1, RSMo 1855.[4] The mechanic's

---

**3.** The first mechanic's lien statute was adopted in Maryland to promote and encourage the building of the nation's capitol. *Freeform Pools, Inc. v. Strawbridge Home for Boys,*

*Inc.,* 228 Md. 297, 179 A.2d 683, 686 n. 1 (1962).

**4.** The mechanic's lien law in effect prior to 1855 appears to have been first enacted on

lien statute is remedial in nature and should be construed as favorably to mechanics and materialmen as their terms permit. *Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 84 (Mo.App.1979). Nevertheless, it cannot be extended to facts not fairly within its general scope. *McGuinn v. Federated Mines & Milling Co.*, 160 Mo.App. 28, 141 S.W. 467, 469 (1911). Its purpose is to guarantee effective security to those who furnish labor and materials for the improvement of the owner's property. *Ladue Contracting Co. v. Land Dev. Co.*, 337 S.W.2d 578, 584 (Mo.App.1960).

Bates argues that, under Missouri law, its lien attached at the time that the concrete material was delivered and incorporated into the construction of the foundation. More precisely, it argues that the trial court erred in holding that the lien was extinguished by removal of the foundation by the property owner. Implicit in this argument is the contention that, once the materials are incorporated into the construction, the policy of the mechanic's lien law as applied to an innocent supplier places the risk of loss on the property owner.

 Both parties agree with the general principle that, in order for a materials supplier to assert a mechanic's (or, more properly, materialman's) lien against property, those materials must have " 'actually entered' or 'went into' or were 'used in' the construction of the building." *Boyer Lumber, Inc. v. Blair*, 510 S.W.2d 738, 745

(Mo.App.1974). To be "used in" the property, it is not essential that the supplied materials become a permanent part of the construction. *Id.*[5] However, if the supplied materials do not become a permanent part of the structure, then a mechanic's lien is available only if the use or consumption of those materials was necessary for completion of the finished structure. *See id.* (quoting *Oliver L. Taetz, Inc. v. Groff*, 363 Mo. 825, 253 S.W.2d 824, 831 (Mo. 1953)). Cole argues, however, that the materials supplied must be integrated into the final structure and thereby improve the land. She relies heavily upon *Shine's Executrix v. Heimburger*, 60 Mo.App. 174 (Mo.App.1895), and *Tallman Co. v. Villmer*, 133 S.W.2d 1085 (Mo.App.1939).

In *Shine's Executrix*, the issue was whether a subcontractor could obtain a mechanic's lien for work performed on a brick building destroyed due to a wind storm prior to the building's completion and rebuilt by another subcontractor (after the first subcontractor refused to perform the work). *See* 60 Mo.App. at 176. The appellate court reviewed cases from a number of different jurisdictions before reaching the conclusion that, where the building was destroyed during construction and prior to completion and acceptance by the property owner, the property owner should not bear the loss, in the absence of a contract provision to the contrary. *See id.* at 185. From that premise, the court

---

December 19, 1821. Under that provision:

Artisans, builders, mechanics and those who furnish materials for buildings shall have a lien upon such materials furnished, and to work and labor done on houses and other edifices by them hereinafter erected in whole or in part, each artisan, builder, mechanic and laborer for his own work and each of those who furnish materials, for so much as the said materials are worth or agreed to be paid for.

1 TERRITORIAL LAWS, p. 803 (1842) (Chapter 346, Section 1).

5. It appears that the policy reason behind this requirement was to prevent contractors from obtaining material from suppliers for a particular construction project, having the materials delivered to the job site, then covertly transporting those materials to a separate construction site for use in another building. *See State v. Gregory*, 170 Mo. 598, 71 S.W. 170, 171 (1902).

concluded that the subcontractor was not entitled to a mechanic's lien against either the land or the structures upon it. *See id.*

In *Tallman,* the supplier of a hot water heating plant was unable to claim a lien interest where the hot water heating plant was only partially installed in a building, before being removed and replaced by a substitute unit by the property owner. *See* 133 S.W.2d at 1088. In the court's view, the original heating plant not only failed to become part of the structure, it also held that a lien was unavailable because it did not provide any "benefit or improvement" to the property. *See id.*

*Shine's Executrix,* however, has several factual differences from the case at hand whose potential significance bears further examination. First and foremost, the *Shine's Executrix* decision involves a brick subcontractor who also supplied the brick and was, therefore, both a subcontractor and a materialman. There, the court approvingly discussed a rule from other states that, as between the *general contractor* and the homeowner, the risk of loss from destruction of the building was a matter for contract between the parties and that, in the absence of a risk allocation provision, the general contractor should bear the loss because his contractual obligation to build the house was unconditional. 60 Mo.App. at 184. As the court then noted, its precise question was who should bear the risk as between a *subcontractor* and the homeowner. *See id.* at 183–84. And, very importantly, the Court said that the answer was largely not to be found in construction of the mechanic's lien statute but rather in principles of equity and fairness:

> The building, before its completion or acceptance, was destroyed by the act of God [a windstorm]. Mrs. Carroll received no benefit from the work performed by Shine. In equity she ought not to pay for it *unless* she carried the risk.

*Id.* at 183 (italics added). Here, Cole grabs upon this reference to "no benefit from the work" and urges that, based upon this language, together with other cases referencing an improvement to the value of property, no lien is permitted under the mechanic's lien statute unless there has been benefit or added value to the property. Clearly, however, the *Shine's Executrix* court did not hold that improvement to the value of the property was a statutory element of a mechanic's lien claim. The lack of benefit to the property, rather, was a consideration in determining whether, under equity principles, a lien already attached should be extinguished. *See id.*

*Shine's Executrix* next considered whether the subcontractor was subject to these same equitable considerations. The court said that "[a]ll the cases concede that a subcontractor is bound to look to the terms of contract between the contractor and the owner" (subject to an exception not relevant here). *Id.* at 184. From these premises, the court denied his request for a lien on the material or his services:

> [W]here there has been an entire destruction of the building under such circumstances [accidental causes], and none of the old materials have been used in its reconstruction, neither the land nor the new building can be subjected to claims for work done or materials furnished for the first building. To hold otherwise would violate the principle underlying all mechanics lien statutes.

*Id.* at 185. The question remained, however, whether the same rule would apply to those that were solely materialmen, as opposed to also being a subcontractor providing labor on the project, or whether it would apply to other types of destruction

or removal of the materials supplied by the materialman.

Cole's heavy reliance upon *Tallman* is, likewise, of limited value. Although the court did say that the lien was properly denied because the materials (a heating plant) did not become a part of the building or add value to it (because it was removed at the direction of the owner when the contractor failed to complete the work), it clearly distinguished its own case from other cases involving materialmen where the material is used, consumed, or depreciated in the construction of the building. Particularly, the court noted the holding in *Darlington Lumber Co. v. Westlake Construction Co.*, 161 Mo.App. 723, 141 S.W. 931, 933 (1911), that, although the materials (lumber used to construct concrete forms) supplied must enter into the construction of the building, they need not become a permanent part of the structure. *Tallman*, 133 S.W.2d at 1088.

Although relied upon by Bates, *Darlington* is also of limited value to our analysis. Unlike the case at bar, there was no issue in *Darlington* of defective installation of the construction materials or that the destruction or removal of the materials was for any reason other than normal consumption in the construction process. Most of the other cases cited by both parties (except for cases from other jurisdictions cited by Bates which will be discussed below) state only general principles of mechanic's lien law and have no direct application to our fact situation. Our own independent research has revealed only a few cases involving material suppliers who were not also contractors or subcontractors performing construction work, as well.

In both *Davidson v. Fisher*, 258 S.W.2d 297 (Mo.App.1953), and in *Kansas City*

*Electrical Supply Co. v. Bomar Electric Co.*, 581 S.W.2d 411 (Mo.App.1979), a request from a material supplier to impose a lien was denied because of the lack of evidence that the materials were *ever* used in the construction process. *See Davidson*, 258 S.W.2d at 302; *Bomar*, 581 S.W.2d at 413. The question in those cases was whether the materials supplied entered into the construction at all. *See Davidson*, 258 S.W.2d at 302; *Bomar*, 581 S.W.2d at 413. There was no issue, therefore, as to whether the materials were defectively installed. Here, there is no dispute that Bates' concrete was delivered to the job site and was actually used in the construction of a foundation on the property.

In *U.S. Water Co. v. Sunny Slope Realty Co.*, 152 Mo.App. 300, 133 S.W. 371 (1911), the only issue was whether, for filing time purposes, "accrual of indebtedness" referred to accrual against the contractor or the building. The court said:

> While the material is sold to the contractor, and while it becomes an indebtedness which accrues against him from the time the sale is completed, yet the very foundation of the lien is that the sale is for the building, and he extends credit to the building. So far as the materialman is concerned, the materialman does not furnish to the subcontractor; he furnishes to the building and he extends credit to the building.[6]

*Id.* at 372. While this case does not directly address the situation present here, the above statement signifies a distinction between the status and treatment of materialmen vis-à-vis contractors and subcontractors with regards to mechanic's liens.

---

**6.** The opinion explains that, while the value of damages against the owner is the reasonable value of the materials, this may or may not be the contract price with the contractor or subcontractor. *Id.*

The earliest case that we have discovered suggesting an importance to this distinction, in a more relevant context, is *Hydraulic–Press & Brick Co. v. Green*, 177 Mo.App. 308, 164 S.W. 250 (1914). Hydraulic–Press supplied brick for construction of a building by Green, the owners' contractor. When Hydraulic–Press sued for a lien, the owners defended on several grounds, including that the contractor did not properly install some of the brick mortar, the contractor made a mistake in the placement of a wall and it had to be rebuilt, that some bricks were wasted when the wall was torn down, that too many bricks were ordered, and that the contractor was guilty of a variety of other misdeeds in the construction of the building. After the defendants' *pro se* victory at trial, Hydraulic–Press appealed, arguing that the court should not have admitted much of the defendants' evidence about the contractor's misconduct and that it was entitled to a mechanic's lien for the reasonable value of the materials it supplied.

The court reversed, saying that "[t]he case appears to have been tried on an erroneous view of the nature of the respective relations of owner and contractor and contractor and materialman." *Id.* at 252. After quoting from Section 8122, RSMo 1909, which, in relevant part, is identical to the present Section 429.010, RSMo 2000, the court said:

> A materialman who, under contract with the contractor erecting a building under contract with the owner, furnishes materials for use in the building which are so used is entitled to a lien on the premises for the reasonable value of such materials, and to enforce such lien, *regardless of the defaults and delinquencies of the contractor in the performance of his contract with the owner.*

*Id.* (emphasis added). The court then held that the only remaining inquiries were whether or not the materials were used in the building and whether materials are used "when they are reasonably consumed in the improvement, regardless of whether or not they are made an integral part of the permanent structure." *Id.* at 253. Although *Hydraulic–Press* is highly instructional on the difference between the relationship of owners with materialman, as opposed to contractors, it, again, did not involve complete destruction or removal of the improvements, since virtually all of the brick supplied by Hydraulic–Press was reused when the wall was rebuilt.

The only other Missouri case [7] involving a materialman and destruction or removal of the improvement is *Boyer Lumber, Inc. v. Blair*, 510 S.W.2d 738 (Mo.App.1974) (overruled for other reasons in *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513 S.W.2d 365 (Mo.1974)). Boyer Lumber supplied various building materials for construction of a house. After construction was well along, a fire occurred in the attic, damaging the roof and also burning some paneling that that was stacked on floors but had not yet been installed. Replacement costs for the lumber destroyed were approximately $2,000. The trial court granted Boyer Lumber a mechanic's lien for over $12,000, including the cost of the replacement paneling. On appeal, there were a number of issues in dispute, including whether the contractor had diverted some of the new material after the fire to other projects and whether all of the material supplied was reasonably necessary for the home's construction. The appellate court found the evidence sufficient to conclude that the material had been used in the construction and with regard to the burned paneling said, "Although the paneling was not incorporated into the house, it was

---

7. At least that we have discovered.

nevertheless 'consumed' in the sense of being used or depreciated before it could have been incorporated into the structure and we believe that in this posture it should be considered as a lienable item." *Id.* at 747.[8]

Bates County also points to a number of decisions in other states. It claims that there is a division of opinion among the states largely turning upon whether the state follows the so-called "Pennsylvania Rule." That rule, it appears from the sources cited, strictly eliminates a mechanic's lien when the building is destroyed or removed from the land, for whatever reason and without reference to any fault by any party. The sources also suggest that the Pennsylvania Rule is a minority view.

We have discovered no Missouri case expressly referencing the Pennsylvania Rule, but the court in *Shine's Executrix* discussed Pennsylvania cases applying that rule and cases from other jurisdictions applying a different rule. 60 Mo.App. at 179–84. The court seemed to find that the essential difference between the two lines of foreign cases depends either upon a policy decision (as in Pennsylvania) or when the lien attaches. The court observed that in New York the lien attached only when the notice of lien was filed, where in other states the lien attached at the time the work was performed or the materials were delivered. *See id.* at 180–82. Without further explication or discussion of these differences, and perhaps due to the divergent positions taken in the

various cases, the *Shine's Executrix* court found itself "substantially without a precedent." *Id.* at 183.[9]

Our Supreme Court recognized early the danger of relying upon decisions of other states in interpreting Missouri's mechanic's lien law. In *Henry & Coatsworth Co. v. Evans*, 97 Mo. 47, 10 S.W. 868 (1889), the Court said regarding the gradual development of such laws in Missouri from early statehood days that:

> Its framers embodied in it some materials acquired from the statutes of other states, and some of the products of their own labor, forming thus a composite structure in many respects unlike the laws elsewhere on the subject. The points of dissimilarity must be clearly borne in mind to avoid the error of applying, to the interpretation of our own statute, decisions of other states construing language quite different.

*Id.* at 868–69. Although the issue in *Henry & Coatsworth Co.* was different from that now presented, the same principle must be recognized when arguments are made that Missouri follows (or should follow) the "Pennsylvania Rule" or "New York Rule" or some other rule, or that decisions of other states should be persuasive in the context of Missouri mechanic's lien law.

Bates argues that we should decline to follow *Shine's Executrix* and adopt what it claims to be the majority rule within decisions of other states. Although *Shine's Executrix* may be subject to some criti-

---

8. In one other case, *Berkshire Lumber Co. v. J.S. Chick Inv. Co.*, 168 Mo.App. 342, 153 S.W. 1078 (1913), a lien for materials was granted even though it had been torn out by the owner as "not satisfactory." Without discussion or citation to any authority the court said that the flooring was of the kind and quality ordered. "If put into the building and then torn out, the loss should not be put upon plaintiff." *Id.* at 1079.

9. The difficulty in classifying various states on any of these issues, and particularly upon the present issue, has been recognized by various secondary sources. *See generally*, 53 Am. Jr.2d *Mechanic's Liens*, Section 316; *See also* Annotation, *Destruction, demolition, removal of, or damage to improvement as affecting mechanic's lien*, 74 A.L.R. 428 (1931).

cism as to subcontractors, it is distinguishable from the case at hand upon the same equitable principles and concepts of risk of loss that compelled the *Shine's Executrix* court to reach its decision. We view *Shine's Executrix* as neither adopting the "Pennsylvania Rule" nor any other foreign rule but was, instead, based upon a policy consideration of who should bear the risk of loss under those particular facts. Because the contractor had the opportunity to contractually allocate the risk of accidental destruction to the owner (or even to insure his own risk) the equities favored placing the loss on the contractor, rather than the innocent property owner. The specific subcontractor, in turn, because of his contractual relationship as agent for the general contractor, was subjected to the same duties and risks as the contractor.[10] As to materials provided by a subcontractor, he has an insurable interest in those materials and can protect some portion of his risk. He can also potentially protect the value of his labor by a performance or payment bond.

■ Despite the holding in *Shine's Executrix*, the general policy in Missouri mechanic's lien law has remained that the statutes are to be liberally construed as favorably to materialmen as their terms permit, *Refrigeration Supplies, Inc. v. J.L. Mason of Mo., Inc.*, 872 S.W.2d 105, 107 (Mo.App.1994), subject to the requirement that the lien claimant prove reasonable and substantial compliance with the statutory requirements. *Patrick V. Koepke Constr., Inc. v. Woodsage Constr. Co.*, 844 S.W.2d 508, 512 (Mo.App.1992).

The materialman stands in a far different position than a contractor. He has no contractual relationship with the owner. Because the contractor is the agent of the owner only for purposes of binding the land for payment of the materialman's debt, the supplier cannot seek a personal judgment against the owner. The materialman, unlike the contractor, cannot contractually allocate the risk of loss and would likely be unable to insure most risks, since he parts with his interest in the materials once they are sold and delivered. Further, unless the materials themselves be defective, the materialman is totally innocent and removed from the malfeasance of the contractor (who is chosen by the owner) in the use of the materials and is at least as innocent as the owner in the event of accidental destruction of the building in which the materials had been used.

Again, *Henry & Coatsworth* touches upon these principles but in a different context. There, a subcontractor sought a lien for the reasonable value of his materials and the owner attempted to defend upon the basis that the aggregate of all liens exceeded the owner's contract price with the general contractor, and the owner had paid the full contract price to the general who used it to pay other liens. The court said that the risk of recovery from the general contractor has been placed by the legislature upon the owner rather than upon subcontractors who supply materials and labor. 10 S.W. at 872. The court then explained that this allocation of risk was the application "of the familiar legal principle that, when one of two innocent parties must suffer a loss by reason of the fault of a third, that loss should be borne by him who gave the third

---

**10.** *Shine's Executrix* did not consider some of the important differences between a general contractor and a subcontractor. Some specific differences between the general contractor and subcontractor are that the subcontractor usually contracts to perform a specific portion of the work, not a completed building, and has no contractual relationship with the owner which would provide the opportunity for risk allocation.

person power to commit the fault. The aim seems to be to protect those whose material or labor has enhanced the value of property, against the business misfortunes or possible frauds of any middleman, at whose instance they furnished the same." *Id.* (citations omitted). We believe that this principle has persuasive application in situations, such as here, where a materialman advances credit to land at the request of a contractor chosen by the owner and the contractor (or his agent) then performs the work deficiently. The owner is in a better position to see that a contractor performs his job properly than the one who supplies the materials. This conclusion is consistent with the statutory intent to protect laborers and materialman.

Given the purpose of the mechanic's lien law to encourage suppliers to extend credit to the land for improvements to be made, we believe that the proper result is that the innocent materialman be entitled to a mechanic's lien, even for defectively installed materials that are subsequently removed from the property. We recognize that the owner here is also innocent, as compared to those responsible for the defective installation of the concrete. However, as observed in *Farmington Building Supply Co. v. L.D. Pyatt Construction Co.,* 627 S.W.2d 648, 650 n. 1 (Mo.App.1981), "[g]iven the usual doctrine that where one of two innocent parties must suffer loss[,] the loss should be borne by the one most culpable, this statutory scheme [the mechanic's lien law] is an anomaly."

Bates was entitled to its mechanic's lien upon Cole's property. The trial court, therefore, erroneously applied the law in rendering judgment in Cole's favor. The cause is reversed and remanded with directions to enter a judgment for Bates on its lien claim.

THOMAS H. NEWTON, Presiding Judge, and HAROLD L. LOWENSTEIN, Judge, concur.